We'll hear argument next in Case 2351, Bissonnette v. LePage Bakeries. Ms. Bennett. Thank you. Mr. Chief Justice, and may it please the Court, less than two years ago in Southwest v. Saxon, this Court carefully examined the text and history of the Federal Arbitration Act's worker exemption, and it held that the exemption applies to, quote, any class of workers directly involved in transporting goods across state or international borders. Flowers now asks this Court to add an additional unwritten requirement, that the worker's employer must sell transportation. According to Flowers, if the thousands of truck drivers who work full-time hauling its goods were only employed by a trucking company that Flowers had hired to do so, then they'd be exempt transportation workers. But because Flowers essentially created its own in-house trucking company, it says that those same truck drivers are no longer transportation workers. That distinction has no basis in the text of the statute. Flowers' only attempt at a textual argument is its invocation of a justum generis. But that argument fails from the start, because Flowers can't identify a single example of the word seaman ever being defined based on whether a worker's employer sold transportation. In fact, if Flowers' drivers were on boats rather than trucks, under Flowers' own definition of seaman, they would be seaman. In the words of Saxon, that sinks the company's a justum generis argument. Unable to rely on the text, Flowers pivots to administrability. But even if this Court could rewrite statutes to make them easier to apply, Flowers' rule is anything but workable. Flowers can't even explain how it would apply in this very case. This Court should reject Flowers' attempt to add to the FAA an employer-based industry requirement that is both atextual and unworkable. I welcome this Court's questions. If this case is decided in your favor, would it affect a separate question of whether or No, I don't think it would. The only question, you know, as this case comes to the Court, built into the question presented is the assumption that the workers are members of a class of workers engaged in interstate commerce. It wouldn't affect that at all. The only question here is, assuming that to be true, is there an additional requirement that the individual plaintiffs be employed by a company that's in the transportation industry? So why would the inquiry into transportation industry be any more complicated than the inquiry into transportation workers? So by transportation workers, I take it you mean whether someone is directly involved. So I think there are certainly going to be edge cases about whether a class of workers is directly involved in transporting goods across state or international borders. We can see that. But what Flowers is asking is that we adopt an additional requirement on top of that that wouldn't obviate that inquiry. So take, for example, Amazon. So it has trucks traveling across the highway, it has planes in the air. Maybe there's a difficult question about whether those, say, truckers are directly involved in transporting goods across borders. But what Flowers says is in addition to figuring out that question, we also have to figure out whether Amazon sells transportation. So how do we know? Do we need discovery into whether it sells transportation? Does it matter who it sells it to? Does it just have to sell it to its customers? Does it have to sell it to other companies? Does it matter how much transportation it sells? Does it matter what percentage of its prices and revenues? All of these are going to be difficult questions that are then layered on top of the question you raised, which is already in the text of the statute. And so in an Amazon's case, for example, it doesn't get us out of the question you raised. It just adds an additional one on top. In the opening, you emphasized the text quite a bit. But in Houston Generous cases, by definition, we're not following the literal text of the residual clause. Instead, we're looking at the listed items and trying to discern what connects those listed items, what feature of those listed items is common. And as the Scalia-Garner treatise says, that can be somewhat indeterminate, difficult position for judges, but we have to try to figure it out. So seamen and railroad employees in 1925, one thing that it seems was going on, but I want to get your reaction to, is Congress took them out of this arbitration regime. All workers, all contracts of employment are subject to arbitration. Takes them out, but takes them out seemingly, you have to look at the legal context, I would think, because they had a separate arbitration regime that already existed. In other words, at least as I read the record, and it is murky in parts, I'll grant you, as of 1925, Congress didn't want anyone to be outside of arbitration. They wanted Section 2 for most workers and then not for seamen and railroad employees because there was a separate arbitration regime. Why, when we look at the common legal context that connects those terms, isn't that the correct way to look at it? Why is that wrong? There are two answers to that. One is we know that Congress wasn't exempting just workers who had alternative dispute resolution regimes because it added the residual clause, and that residual clause would have covered no workers at all at the time. At the time, but what Congress was doing, arguably, this is the argument, was contemplating there would be future industries that would fit in, and in 1936, the airline industry comes in and those employees are funneled into the same kind of separate arbitration or the railway arbitration regime. So that Congress was accommodating the future. Sure. So the second historical answer to that is even if this Court were going to try to discern some purpose of the exemption instead of focusing specifically on the text, which is difficult a hundred years later, if you look at seamen, I think one of the assumptions underlying that question is seamen were going to arbitration, that there was a mandatory arbitration scheme that covered seamen, and that's actually just not correct. So the Shipping Commissioners Act, which is the statute that provided for shipping commissioner arbitration for seamen, two things about that. It wasn't limited to employers who sold transportation. So it was, it had geographic limitations. It was about seamen who were traveling abroad, coast-to-coast, and some coast-wise seamen, like the people on lumber boats who would have been employed in lumber companies. So even if you think that's the purpose of the exemption, is to accommodate these alternative dispute resolution schemes, adding an employer-based industry requirement would actually conflict with that purpose. But I also want to take a step back and talk about what the dispute resolution scheme was governing seamen at the time. And this court has discussed that in its U.S. bulk carriers case. And what the court said is, from the beginning of time, essentially, seamen have been wards of the court. They've been subject to the court's protection with a right to bring cases in court. And since 1790, Congress had enshrined that right in statutes. And what the Shipping Commissioners Act did is it said, if certain seamen, after a dispute arises, if they agree with the master of their boat in writing to go to the shipping commissioner, then they can do so. And what this court held is that imposing a pre-dispute mandatory arbitration scheme would conflict with this age-old right to go to court. So you think Congress, in 1925, wanted seamen to be able to go straight to court? I think that's exactly right. And I think that's what the— Is there anything to support that? Sure. So there are a few things. One is what this court said in U.S. bulk carriers. If you look at the title of the U.S. Code, which is Title 46, enacted in 1925, the same year that the Federal Arbitration Act was enacted, what you'll see is references all of the—a lot of the rights. The references say you can go to court. And if you look at the Shipping Commissioners Act itself, it only applies if, after the dispute has arisen, the parties to the dispute agree in writing to go to arbitration. In other words, it only applies post-disputes quite different than what the Federal Arbitration Act would require. And this court explained all of this in the U.S. bulk carriers case. In that case, it was looking at grievance arbitration, but the principles apply. And the principles are this mandatory pre-dispute arbitration statute would have interrupted all of this. Counsel, can I—I'm sorry, you finished just a second. Go ahead. Is there any continuing reason—and this is just my ignorance, so I'm just going to be curious—we're talking about why 1925, what the regulatory regime was, and whether Congress wanted to funnel some of these transportation workers into alternative dispute resolution mechanisms. Is this now just an anachronism, or is there any continuing reason for transportation workers to be exempt? So it's—I'll be quite honest with you, which is it's not clear entirely what the purpose was in 1925. It's not clear now. You know, I think if you—if you look at the history, what was happening is that there were, you know, strike after strike in the transportation—among transportation workers and in—and among maritime workers, and specifically, the strikes were—the core of those strikers were lumberboats, people who were not employed by employers in the transportation industry. And to the extent that what Congress was doing is saying, these people are really important to our economy, and every time they strike, they are interrupting commerce. You know, the seamen strike amongst the lumberboats in 1923 interrupted the whole building boom on the West Coast, and so— But that's all from the past, right? Sure. So putting that— So my question is just like, yeah, now. Right. So putting that in that context, you know, one thing that courts do and that group-based arbitration does is it makes transparent issues that are coming up amongst transportation workers and amongst these companies, and it gives Congress and the executive branch, which was often involved in these disputes in the past, insight into how these disputes are for heading them off. And so I do think there's a modern reason, you know, to the extent we think that was the reason in 1925, it's no different now, what it—in that people going to court and people going to sort of labor-based grievance, group-based arbitration, like in the railroad statutes, would flag these kinds of disputes, perhaps before they end up, you know, in nationwide strikes that are going to interrupt commerce. The Second Circuit did not rely on the district court's reasoning, and so it's not before us, but this is more a curiosity on my part. The district court, I understood, said they're not transportation workers because they do more that's office-based. They're not a traditional transportation worker. How do you deal with that? If someone's job is, you know, at the end of the day, they're making all this product, but they deliver it from here to somewhere else, that's enough for you? So I think there's a factual answer to that question and a legal answer, and I'll take the legal question first, which is I think what you're raising is the question of some workers have different tasks that they do, and how do we deal with that question? And the first stab I would take at that is to look at this court's decision in Saxon, actually. You know, Ms. Saxon in Saxon spent three days a week, roughly, loading and unloading cargo, and two days a week supervising other people, and what this court said is three days a week is enough. We don't need to look at whether the supervision counts, and so there may be, I think, tough questions in very few cases, actually, where people are having multiple jobs. I'll note that these aren't, we haven't seen them in the lower courts. It doesn't come up often, and the way I would deal with answering them, you know, if it's, say, less than Saxon, but more than ever, is to look, you know, I would do two things. One is I would look in 1925 and see, for example, how much of the time did someone have to spend doing the kinds of work that somebody is doing to be a seaman and a railroad employee? I'd also note that this comes up in other statutory regimes, and I might look at those cases. So, for example, there's a whole body of law around the Jones Act, which is the case that involves the statute governing when seamen are injured and when they can bring claims about what percentage of the time the person has to be connected to the vessel in order for them to be a seaman. And so I might look at that body of law. There's a body of law under the Motor Carriers Act about how much a company needs to be engaged in commerce to be subject to that act. So it's not an unusual question, and courts have tools to answer that question. It's also not a question that comes up much. Can I ask you about Saxon itself and also comments in your brief that it would make no sense to adopt the opposing side's view? Because in Saxon, an oral argument, it was repeatedly stated to us, if we're talking about a company that is shipping its own goods, those people likely wouldn't have been railroad employees or seamen at the time. Not just Amazon department stores. Those people are likely not exempt, and here's why. There was a distinction that was made between railroads that ship things for the public, and I think that's how we normally understood, understand seamen and railroad employees and say a coal company's internal railroads. And there's more. We have seamen and railroad employees, the two classes of workers that had preexisting dispute resolution statutes at the time and were commonly understood categories. As a class, the seamen are the people who do the work of the shipping industry. As a class, railroad employees are people who do the work of the railroad industry. Now, I bring that up, not to bind anyone, I bring that up just because that was the common sense understanding of Saxon, and so it seems odd that you would read the Saxon opinion to have blown through those limits that were being stressed by counsel for Saxon about the implications of the position. Number one, and it seems odd also to say the other side's position just makes no sense when given what was said at the oral argument in Saxon. So I just want to give you an opportunity to respond to that. Sure. A few responses to that. One is, you know, we don't read Saxon to decide the question presented here. I certainly didn't think that based on what happened at oral arguments. Sure. And I think it leaves the question presented open, although I will say I think Flower's with the reasoning of Saxon, which is we look at what these words meant in 1925, and we also are looking for a commonality between seamen and railroad employees, and if there isn't that commonality, we're not going to add an additional requirement. Now, I think you asked about some answers to the hypotheticals in Saxon, and I'll note that this question wasn't presented either way in Saxon, and there were some hypotheticals I do think that touched on this question, but I apologize if the answer wasn't as clear as it should have been. Well, I hope the answer was very clear, actually. It was reassuring. I think the word narrow was used, reassuring that the holding in favor of Saxon would be narrow and would not extend to industries other than transportation industry, which that may be incorrect, but to call it like that makes no sense is a little much for me, at least. Sure. And I think the gravamonte, you know, there were specific predictions maybe, but the gravamonte on that answer is to know whether the Federal Arbitration Act exempts a particular class of workers, we'd have to do is go back and look in 1925 and see what these words meant, and we've now, you know, because it wasn't the question presented in Saxon, that research hadn't been done, we've now done that, and I think it's very clear that in 1925, the word seamen did not mean somebody who was employed by a company that sold transportation, and I'd like to turn to that briefly, if I may. Every source we have, when you go back and take a look, you have dictionaries, case law books, other statutes, literally any piece of evidence we have confirms that the word seaman included anyone who worked aboard a vessel in furtherance of its purpose. It had nothing to do with whether an employer sold transportation or in the Second Circuit's word had a particular price or revenue structure, and I'll note that this Court has already canvassed this history at least twice, first in Willinder and then again in Saxon, and at both times it came to the same conclusion, which is that seaman, seamen rather, is a long-standing, well-defined term that in 1925 plainly meant everybody who worked aboard a vessel. Now, to its credit, I actually don't take flowers to dispute this ordinary meaning of seamen. Maybe they'll get up and tell me I'm wrong about how I read their brief, but what I take them to say is, you know, whatever the ordinary meaning is, for purposes of the Federal Arbitration Act, the Court should give the word a different definition, and that different definition should be something like workers aboard a ship in a carrying trade, carrying goods for trade and commerce. And there are two problems, though, with this request. The first is, not only is this not the ordinary meaning of seaman in 1925, it's not any meaning ever of seaman in 1925 or since then. What that definition comes from is a definition that a single district court gave to the term merchant vessel is nowhere in the Federal Arbitration Act. So flowers has to demonstrate a commonality between seamen and railroad employees, not between railroad employees and merchant vessels. So that's the first problem. It's just not in the statute. The second problem, though, is that even if this Court were willing to accept this definition of words that aren't even in the statute as the definition of seamen for purposes of the Federal Arbitration Act, and define it in accordance with what flowers says we should define it, flowers' drivers meet its own definition. There's no question that flowers' truck drivers are engaged in transporting goods for commerce, just like the people on lumber boats in 1925, just like the people on the barges carrying railroad-tie manufacturer's goods in this Court's decision in air. And so even if we were to accept every single one of flowers' arguments on seamen, they have nothing to do with the words of the statute. And just to understand, what are the categories of seamen who do not work in the shipping industry? There's a vast number of them. And they're not, you know, one thing that's difficult is they're not, well, so I actually, I want to take a step back and talk about the word industry very briefly, which is when you say in the shipping industry, we can mean two different things. One is we can mean the workers who are in the industry, as in these are people who do shipping work. They do the work of the boat. Or you can mean sort of an employer-based requirement, which is they work for a company that sells transportation on flowers' version. And I think the intuition that seamen and railroad employees are definitely in the transportation industry is the intuition on the first question about individualization. So assuming what I meant was the second? Sure. So who are the seamen who are not working for shippers? There's a bunch of them. So there are a bunch of manufacturers, for example, who employed seamen. There's a railroad tie manufacturer, for example, in Ayer, employed seamen. There were lumber boats all up and down the West Coast that employed seamen. They worked for lumber companies. They didn't work for transportation companies. There were coal companies that employed seamen. The Ford Motor Company employed seamen. There's a host of employers that employed seamen. And the reason is very similar to why you have a host of companies employing truckers today, which is that unlike railroads, which require, you know, like a track, and a railroad, which is expensive and infrastructure-heavy and can only be laid in certain places, all you needed to ship your own goods is a boat, just like a car. Before 1925, and you might have addressed this earlier, but I want to make sure I have it nailed down, before 1925, could those employees who worked, as Justice Kagan said, not in the shipping industry, but, say, lumber barges and that kind of thing, if they had a dispute, did it go to the shipping arbitration regime, or did it go to court? They could choose. So the shipping arbitration regime, it applied to anybody who was not paid on profit share, who was on an international voyage, a coast-to-coast voyage, or a coasting voyage, if they had signed shipping articles before the shipping commission. But that, I think that blends into my concern earlier, that the linkage was, even if you have a slightly broader category of seamen than they say, they were covered by the separate arbitration regime, I think is what you're saying. Some were and some were not, and it would depend on the length of their voyage, essentially. And didn't you also say it depended on whether they chose afterwards? Yes, that's exactly right. So it was only if, even the seamen who were covered by this statute would only go to arbitration if they chose to do so along with the master of their boat. I do want to understand, though, Justice Kavanaugh's point, who would not have been included in the regime? You said there are some seamen who wouldn't be. Who are they? So anybody who was on a coasting voyage who did not sign their shipping articles in front of a shipping commissioner. So to take the lumber boat as an example, the lumber boat workers who had signed shipping articles before the shipping commissioner could have gone to shipping commissioner arbitration. Those who didn't could not. Anybody who wasn't on an ocean voyage. So anybody who was on a river or on a lake, those were certainly seamen. They could not have... Categorically outside the arbitration provision. Categorically outside because those voyages were only international, coast to coast, or coast-wise. So anybody doing seamen's work in the internal parts of the United States. Anybody doing seamen's work that was local, that didn't go very far. So for example, this court's decision in Ellis talks about dredgers as being seamen. Got it. Thank you. So even if we reject the transportation industry test, we would still have to distinguish transportation workers from other workers. And you talked a little bit with Justice Sotomayor about that. Are you suggesting that if we side with you in this case, that we take this opportunity to say more about that distinction? Or do you think Saxon covers it? I think Saxon covers it. And Saxon lays out a pretty clear test, which is workers that are directly involved in transporting goods across foreign or state borders. And I'll note, since Saxon, the lower courts are pretty much agreed about what that means. And so I think if there is some further dispute that comes up, perhaps this court may need to weigh in in that case. But I don't think this court needs to do so here. Thank you, counsel. Justice Thomas? Ms. Leto? Justice Sotomayor? Okay. Justice Gorsuch? Your friends on the other side make a large feature about some language in Saxon. And I'm not sure you've quite had a chance to address it yet. But seamen constituted a subset of workers engaged in the maritime shipping industry. Put aside history. How do you deal with that as a matter of precedent? I think there are two answers to that. One is, and they're related, one is the argument that the court was discussing there was just the argument that anybody who did the work of shipping would be exempt and would be a seaman. And what the court was saying is not everybody who did the work of shipping was a seaman. What they were saying, what people who are seamen are people who do the work of shipping on a boat. So I don't think the court was answering that. That's one. You said you had two. The second is related, which is similar to the answer I was giving Justice Kagan earlier, which is what it means to be in an industry. So for example, you know, Jones Day, certainly in the legal services industry, I don't think the head chef at the cafeteria of Jones Day would say that she's in the legal services industry. I think she'd say she's in the food services industry. How does that differ from the first point? I think they're related. It's the same thing. Essentially what the court understood. Okay. All right. Thank you. Justice Kavanaugh? Justice Barrett? Justice Jackson? Thank you, counsel. Thank you. Ms. Levitt? Thank you, Mr. Chief Justice, and may it please the court. As counsel has made clear, petitioners view the Section 1 exemption as encompassing any worker directly involved in a goods interstate journey, from the plant worker who loads goods for shipment to the store clerk who unloads them and shelves them. But in Circuit City, this court said that the Section 1 exemption should be read narrowly and should be interpreted with reference to the adjustum canon, context, and history, all three of which demonstrate that the exemption is limited to transportation industry workers. After all, in 1925, Justice Kavanaugh is correct. Seamen and railroad employees were defined by the industry in which they work. And that commonality should carry through to the residual clause. Context and history tell you why this line makes sense. By 1925, Congress knew that labor disputes involving transportation industry workers were different. They were unique. They could cause famines in Chicago. And in response, Congress passed two, and only two, federal arbitration statutes, one governing railroad employees in the rail industry and one governing seamen who under the Shipping Commissioners Act were limited to those in the shipping industry. Petitioners can't provide a why for the enumeration. They can't explain why you would pair railroad employees and seamen together. And they advocate a definition of seamen that is so broad. It's flatly inconsistent with the notion of a transportation worker and this court's holding in Circuit City. The result, a poor fit. And petitioners show by example. Petitioners buy Flowers Bread. They pay Flowers for product. Then they take title to the bread. And it is only after they take title to the bread that they then move it intrastate in order to sell it to retailers for a profit. They are under no personal obligation to move anything. They look nothing like railroad employees or seamen. I welcome the court's questions. We have looked at the performance of the workers in Saxon. And wouldn't it complicate matters now to look at the entire industry as certainly the Second Circuit did? I don't think so, Justice Thomas. And don't you think, I mean, I thought we foreclosed that. We said that we won't look. The argument, part of the argument in Saxon was, well, Saxon is in the transportation industry, therefore. And as I hear you, you're saying, well, petitioner here is not in the transportation industry, therefore. And we foreclosed that, I thought, in Saxon. So two points, Justice Thomas. The first was that you have to read those holdings in Saxon in light of the background fact that Ms. Saxon was an airline transportation industry worker. The court presupposed that fact. And as Justice Kavanaugh read from the oral argument, that was an accepted fact and part of the background on which the holding was made. The second point is the industry-wide holding. And in that part of the court's opinion, the court was rejecting Ms. Saxon's argument that it was sufficient for her to fall within the Section 1 exemption just because she was a transportation industry worker. And our argument is not that it's sufficient. We think that you have to do the Saxon analysis. But the first question is, is being in the transportation industry necessary? And the answer to that should be yes, because ever since 1972 in the Second Circuit, the background rule has been that you have to be in a transportation industry. That's the Irving decision that predates Circuit City and was on the winning side of the Circuit City split. But we have cases from the 1920s in which you didn't have to be in the transportation industry in order to be counted as a seaman. So how do you square your position with that? So first, I think Saxon informs what it means to be a seaman. But Justice Saxon, those cases aren't dealing with the limit here, which is you already have Circuit City. And Circuit City has already held that, because of the ajustum canon, there are implied limits. And one of those implied limits is it's not a limitless seaman. It's the seaman who are transportation workers. And I think that's where Petitioner's definition gets in trouble. Because Petitioner's freely admit that their seaman are pirates, they're enemy ship folks, they're on recreational boats. I understand, but how do you square that with cases where we have actors aboard a ship being counted as seaman, for example? Most of those are Jones Act cases. And why does that matter when Congress was using the word seaman, as I'm sure it was understood at the time that statute was passed? Two reasons. The first is the Jones Act has a broad remedial purpose. And this Court has repeatedly recognized in the Jones Act context that it's reaching to the outer limit of seaman. The second is that there's no other federal statute that uses railroad employees and seaman together. And Circuit City says that that list has meaning. And that list means that Section 1 seaman are different from other seaman. They share a commonality with railroad employees. And this Court held in Circuit City that that commonality is transportation worker. Well, but the commonality can get very complicated, as your friend on the other side said. I mean, where did the price structure and revenue approach come from? That was part of the Second Circuit's decision. Yeah, but where did they get it? I think the Court was looking to characteristics of folks in the transportation industry and giving a more granular approach to what are common characteristics on the facts of this case. And again, these facts aren't disputed. So there's purposes. No, no, but I mean, they're trying to figure out what the transportation industry is. Right. And again, I think they just kind of made up, I don't use that in a pejorative sense, maybe they created this price structure and revenue approach. But it really imposes a difficult burden, and it would seem to meet a lot of different results. I mean, you'd have conflict among the lower courts considering how that applies. I mean, and the examples they give, I think, are pretty compelling. I mean, is Amazon in the transportation business just because it has a fleet of planes that it uses, or part of Amazon is? So to take your, I have three questions there. So I'll try to keep track of them. But the first question, which is about the Second Circuit's analysis. I think the Second Circuit was giving factors that were relevant to this case. I think the test is broader than that, and it has been broader than that. Because again, the background rule since at least 1972 in the Second Circuit has been you have to be in the transportation industry. And it's been a line between, are you hauling only your own stuff, or is part of your business hauling third-party goods as well? And that's a very clean line. Let's use your Amazon example. I think in Amazon, and again, I don't, I'm not Amazon's counsel, so I'm speaking as purely a consumer. As I understand Amazon, they're shipping not only some Amazon retail products, but their regular course of business involves shipping all sorts of products that they don't manufacture. I think they're clearly in the transportation industry. Well, but sometimes they use their own planes, and sometimes they use FedEx's planes. So and sometimes the workers who do exactly the same thing count as in the transportation industry, but in the other times they don't. Well, again, I think that in the Amazon case, you're in the transportation industry, and they get out for last mile reasons. But to your question, which is sometimes they use FedEx, that's correct. But if we had used FedEx, the defendant in this suit wouldn't be Flowers Foods, it'd be FedEx, because the contract of employment would be between FedEx and the worker. Why would Congress do that? That was your last question. I think that's the key question. And there's a whole lot of reasons why Congress would do this. This is, to us, Section 1, the exemption, is a wholesale policy judgment by Congress that transportation industry workers are different. And we know Congress is making wholesale judgments, because it had put only two classes of workers in arbitration, or had federal arbitration statutes, railroad employees and seamen in the shipping industry. And why would Congress do that? Because up to 1925, there had been many strikes, as petitioners point out. But only strikes involving the transportation industry brought the country to a halt and caused famines in Chicago. And so Congress could reasonably say, this is different. Today, because the economy is different, we can think of all sorts of reasons why that policy judgment doesn't fit on the modern economy. But that doesn't make Congress's judgment in 1925 wrong. But Ms. Leavitt, the Shipping Commissioners Act, Ms. Bennett says that, in fact, it did encompass seamen who were outside of the shipping industry. If I agree with her about that, do you lose? Well, I would disagree with that. And if I can answer that question first, and then you, Mrs. Justice Barrett. So the Shipping Commissioners Act has two large restrictions. The first was in, and I'm citing the 1925 version, 46 USC, Section 464 and Section 465. Section 464 says it's only voyage vessels that have voyages from the East Coast in the United States to the West Coast, and from a port in the United States to a port overseas, not Canada. And then there's a second limit, that you can't be earning a profit from the things that you're shipping. So you're not making your money because you're shipping fish and you're selling the fish. You're making the money off the transportation. Those two limits boil down to the shipping industry. And here's where I think a little bit of history of shipping helps a lot. The Panama Canal didn't open until 1914. So to get from San Francisco to Boston in 1914 was almost a nine-month journey. You don't take that journey and return with an empty ship. Those factors that are in the Shipping Commissioners Act are isolating the industry. And it makes sense because the people who need the arbitration remedy, the seamen who need the arbitration remedy, are those who are going from port to port to port to port to port, going on a new vessel every time. They aren't the employees of a company that's making the same journey back and forth, and they're regularly employed. Except you just pointed out reasons in the statute that limited. So you're saying this wasn't just any seaman, it was seamen who met these particular restrictions. Well, Section 1 doesn't have that additional language. It just says seamen. So why wouldn't Section 1 be a broader subset of the narrower subset that you're talking about? Because in both New Prime and in Circuit City, this Court recognized that the rich fabric upon which the Section 1 exemption was passed was the fabric of the Shipping Commissioners Act and the Railway Act. And both of those were limited, in effect, to the shipping industry workers. And so it would have been unusual at the time to bring in all of these seamen who, again, petitioners can see recreational boats are in. So if you work on a yacht, and you never transport a good, and you're just sightseeing with whoever owns the yacht, you're a seaman within the Section 1 construct. That's not a transportation worker. And that's not what Congress was getting at. They were getting at that narrow subset of workers who actually impact the national commerce and national security. But why do those workers have to be in the industry? I mean, I can agree with you that the statute is about transportation workers, and in fact, we've held that. So we're not talking about, I mean, maybe I would disagree with the representation that you just made about people who are working on a yacht, maybe. But I think the line there is drawn between transportation worker and other workers.  That's why I don't understand where the industry limitation is coming from. That's not in the statute. I think it's coming from, I think it is in the statute. I think it's falling out of the enumeration. We've said the enumeration goes to transportation worker, seamen, railroad workers. The other, we say, is limited by that to mean transportation workers. Got it. Where is the industry coming from? So two points. First, in Saxon, I think this court correctly recognized that it's never given an exhaustive definition of transportation worker. So the industry is coming out of the fact that in 1925, seamen were the seamen on these merchant ships that were in the shipping industry. But what about companies in the 1920s that had their own fleets or own boats or railroad companies or lumber companies that had railroad workers that were their own in-house? They were almost always outside of the Shipping Commissioners Act because they're making these little local journeys that aren't falling within the arbitration provisions. And a lot's been said, if you'd indulge me for 30 seconds, a lot's been said about these lumber schooners. Petitioners actually don't have the history right on lumber schooners. Lumber schooners are a kind of boat, and they were owned by syndicates. The syndicates included all people within, like you can imagine, the people who produced the lumber, the people who were trading in lumber, the people who converted the lumber to two-by-fours, and people who made paper. And they had one, and the master of the vessel. And they had one interest, which was to keep the vessel full. So to the extent that they were- Counsel, isn't all of this an argument for us looking at the last leg drivers and deciding whether this was foreign or interstate commerce as understood at the time? That's where I see this argument. I just don't see it. I mean, by the way, as an aside, Amazon, who's an amicus on your side, doesn't agree with you on pages five to seven in their brief. They say the focus is not on what the employee is doing as part of its duties, the employer is doing, but what the industry is, and it says it's what the employee is doing. Their argument is, what I'm saying your argument is, we have to look more carefully and more narrowly at what foreign or interstate commerce means. Well, two points, Justice Sotomayor. The first is, I doubt they liked my answer that they were in the transportation industry, which might explain what they were doing on pages five through seven. But I do think, if you disagree with us- Well, they're saying they're not, but they don't say that's dispositive. What they're saying is, what's dispositive is that their workers are not engaged in foreign or interstate commerce. And I would agree that if you decide, I think the last mile cases are important, and I think you do have to decide the last mile issue as well as our issue. Not here, but it would be an issue for remand because we've preserved the issue. We don't even have to get into that, whether you preserved it or not, I didn't check. The question is a different question. When I want to get to the heart of that question, which is, is the problem solved by last mile? And no, it's not, because again, the background rule here until about 2020 was that the transportation industry workers were out. And that's why you're not seeing these cases arise until just the past year or so. And so the problem is, you have a lot of companies who are like, I'm just going to say Acme to keep it, you know, the record clean. You have Acme company who actually has their own drivers who cross state lines. That company doesn't see them. They're not in the shipping industries in any way, and they're not preserved by the last mile. And so you start to introduce a whole class of cases. In the modern economy, every retailer, every manufacturer has a shipping department. And those shipping departments are inevitably shipping goods in interstate commerce. And so you'd be, in light of the fact that the background rule excluded transportation industries, you're opening a whole other area that has been, I mean, honestly, if you look at Circuit City, the cases that the court affirmed in Circuit City, the Court of Appeals cases were all assuming a transportation industry component. Ms. Summit, do we care? Let's see. We do care. I want to follow up on Justice Sotomayor's question. If you win, if we say there is an industry requirement on the last mile, if we've shifted our focus to the industry, does that go a long way towards settling the last mile driver question against you? Because then would we say, as long as you're a worker in the industry and the industry is engaged in interstate commerce, you get swept in? Or I understand it wouldn't resolve it, but would it make your argument harder? No, I don't think so. Because we're viewing the industry issue as a threshold issue. It's a necessary condition, not a sufficient one. So you'd still have the Saxon analysis. And the reason why that is important is because you're excluding a whole line of cases that heretofore have been excluded involving manufacturers. You'd still need to decide the last mile question, and I think for the good of the lower courts, it would be good to take one of those cases, because that's an additional limitation, not an alternative limitation, in our view. And one that would, again, I think it's important to deal with both preventing the wave of cases, and again, Petitioner's not denying the fact that this is opening a whole new line of cases that since even before the time of Circuit City were viewed as off-limits under Section 1. It's preventing that waterfall and cascade of cases. Do you think before 1925, as your friend on the other side said, there were some workers who were not covered by any arbitration regime? Industry workers? I mean, higher... So you... Well, that might have loaded the... Yeah. You might have just loaded the question. I think the question was seamen who don't work for what we would call a maritime shipping company fell into this gray area where they were covered by neither arbitration regime, I think, was the theory. And I think that was the theory, or at least the answer. Do you agree with that? So just if I could restate the question to make sure I understand it correctly. Yeah, please do. Is that there were seamen who were outside of the Shipping Commissioners Act, or that don't work in the shipping industry. That would be the leisure example, right? And the recreational boats, the folks who are on lumber schooners that are just doing coast-wise voyages, so they're doing... And those are the traditional manufacturers. They would be outside of the Shipping Commissioners Act. We are operating a bit, just to be candid, there aren't any cases interpreting the Shipping Commissioners Act. So you have to interpret by analogy of what was happening in the rail industries. On the rail industry, it's crystal... Well, crystal clear is a little strong, but it's clear, right, that you had to be an employee of the railroad. Yeah. I mean, we would use the word crystal clear, but in the federal arbitrations provisions governing railroad employees, you had to be an employer of the common carrier. And then just to take it full circle to Saxon, I mean, the cases that this court was citing in Saxon for the idea that a cargo loader was part of interstate commerce, those are all rail common carrier cases. And the holding is, if you're a baggage handler on a railroad that's in the industry providing transportation services, you're clearly in. And so one thing I couldn't figure out is, but I think, the number of workers who are going to be exempt and number of companies who are going to have to deal with this massive if you lose. But I mean, spell that out for me, I'm not sure how to quantify it. So it's massive. Let's, again, these are all new cases in the past, say, five years. In the past five years, you've had cases against Domino's franchisees. So you're bringing in every franchise restaurant, which is why the restaurant industry group filed on our behalf. You're bringing in the medical industry. Medical industry ships like this because they need to get their products very quickly from one place to another. You're bringing in, basically, the entire food industry because, again, these point-to-sale shipments like breads, things that go bad, beer, that whole industry is now in. And the way that the modern economy works, this is how retail works. You're now bringing in every retail industry that is shipping their own. They've got warehouses going to brick and mortars. Those companies are now in. But couldn't that be taken care of through other doctrines? Not through Last Mile, which I think was the question. Yes. Because these are all companies that are shipping over the borders. And the reason why this hasn't been a problem to date is, again, because the background rule has been that it's a transportation industry. And even in Saxon, when you're talking about the seamen who are under Section 1, you're using a subset of the maritime shipping industry. Even this court, and I'm not saying it's a holding or decided anything, but I think it's saying this is the language that's informing the lower courts. Well, that's an important point, and I hope that Ms. Bennett will take the opportunity on rebuttal to address it. But let me just ask, on the other side. It may have been straightforward for the Second Circuit to apply its tests to the facts of this case, but will it be straightforward in other cases? Will it not involve some very difficult line-drawing problems? Justice Alito, in our view, it's not. Ninety-five percent of these cases, it's clear. The FedExes, the UPS, the Yellow Freights, it's very clear who's in the shipping industry because they're in the business of shipping other people's goods. And even there are companies like Amazon who ship their own and other people's, but the usual course of their business is to include other people's goods. They're, you know, most companies, I don't want to use the word most because, but a lot of them. There are not a lot of companies that do, in which, let's say, 60 percent of their work doesn't involve transportation, but, or 70 percent doesn't involve transportation, but 30 percent does. There aren't companies that might fall into that category. I think you could use the Saxon analysis for, you know, Saxon said, how do you determine a worker's work, which is also a fact-based question. Use it whether it's frequent. And I think that's the same kind of straightforward analysis that you could apply here. Are you frequently in the business of shipping other people's goods? And it's no more difficult than the test in Saxon, but it offers a different test and one that's going to exclude this mass body of cases that appear to have not been in the federal courts. Sorry. Go ahead. Is part of what you're saying that the industry has, or industry generally, and the way that business is done now has massively shifted, and maybe those words mean the same thing. Maybe they mean what Ms. Bennett says they do, but because of the way that industry and shipping has changed, just kind of as an anachronism, it doesn't really make sense. And then wouldn't it be for Congress to fix it? I think Congress already fixed it. Because when it enacted Section 1, there is a residual clause. Congress was anticipating that there were going to be other industries that would have the same kind of shipping element to them. And the airline industry, for example, was the very next stop. And they also now have an arbitration provision, which, by the way, to get to your question that you asked Petitioner's Counsel, yes, this is still relevant because we still have massive arbitration regimes governing the rail industry and the air industry. And if you had the FAA coming in, there'd be a question over which one is preeminent. And I could see a whole new line of cases where employers are saying, no, we're outside of that federal regime. We have a private contract. We enforce it under the FAA. So there is interference that could be done under the modern statutes. But I think to get to your point, it's not an anachronism. I think what has changed is that in 1925, industries, there weren't big, long haul, there really wasn't an airline industry, and there really wasn't an over-the-road trucking industry. That didn't really come until the 1950s. And the way people shipped goods is by rail, and if you're shipping or you're shipping long distances in the shipping industry in vessels. And so the Section 1 was really encompassing the entirety of the transportation industry while anticipating that the industry was also evolving, and that Congress might want to get involved there, too. And if I could just make one last point, I think part of the issue here, too, is there's not been any industry component. And now Saxon, if you hold that there's no industry requirement and you combine it with the holding in Saxon, it's not only that you bring in all of these manufacturers who've never been within the scope of one, but you also bring in people who load goods. And the next question is going to be, well, what about the people who package them? What about the people who sort them? What about the people in the shipping department? But I guess what I don't understand is how your theory is consistent with what you say Congress's goals are with respect to Section 1. I mean, throughout your brief, you say that Section 1 was intended to capture workers, quote, critical to commerce and national security. So fine, we now have all these companies that have components of transportation within them, but their workers are doing things, as you say, involving goods that are crossing state lines and that are presumably critical to commerce and national security. So why would the line be between big companies with in-house transportation arms versus those that use FedEx? I'm glad you asked that question, and it's the word presumably, because if something in most labor disputes, if you have a labor dispute between the employer and their employees, the employer is best situated to deal with that dispute. The time when that's not true is when you have transportation industry workers, because there are third party effects that cascade for the customers who have their goods on the rails. But you're saying that that's what Congress, I thought they were just trying not to have the disruption. Congress was saying there are areas of the economy that are so important that we're doing our own federal arbitration scheme. We're not leaving it to the private parties to decide how they're going to resolve these remedies, because they involve third party concerns. And that was the history. In 1925, the railroad labor industry, there were all, again, all sorts of industry disputes, but it was only the rail industry dispute that brought Chicago to the point of famine. And that's when Congress had to intervene. I just thought that was because of the nature of the goods and the fact that they were crossing state lines and they were sort of international. And that's the same with Amazon and Walmart and U.S. foods and companies that have internal transportation arms today. So today, let's take flowers. If flowers can't ship its bread, that problem is best addressed between flowers and its employees. But it doesn't mean that the nation runs out of bread. It means that people are going to have to buy other bread for a little bit of time. And that's true whenever you're talking about a manufacturer. If it's a single manufacturer that has a problem, there are other manufacturers who aren't implicated. Where you start to get the whole of the national economy involved is when you're talking about the international and interstate shipping of goods in that industry. And again, we may come up with a lot of examples today where that doesn't make sense. But in 1925, that was the lesson that Congress had learned. And Congress responded by enacting arbitration provisions for only two members of the economy, two classes of workers. And they were both in the transportation industry. I just want to make sure that the background principles, I got them in my head right. These contracts that these employees have with the employers could be enforceable in state court. If they require arbitration in state court, if you file a suit in state court or they file a suit in state court, those arbitration agreements have to be honored, correct? That's the position we took in the lower court. But there's a circuit court split on that question as well. And I don't think that's a good answer. Because in a lot of states, you couldn't arbitrate this at all either. So you don't get- Because of state laws not permitting it? Because of the state law. Got it. You have no other questions? Thank you, counsel. Justice Thomas? One question. Is the phrase common carrier helpful or not helpful here? I don't think it's helpful. Because in the shipping industry, I mean, common carriers would mean ferries. And there's a whole component of the shipping industry that aren't common carriers that are really at the heart of it. Thank you. Justice Jackson? Thank you, counsel. Thank you. Ms. Bennett, rebuttal? Sure. So I just want to make- thank you, Your Honor. I just want to make three quick points. The first is on the text. I didn't hear a single argument that any word in this text means somebody works for an employer that sells transportation. Again, even if we accept Flowers' understanding of what the word seamen meant in 1925, and put aside fishermen and any of the other people they're worried about, even if we accept it's just people who are on vessels transporting goods for commerce, that has nothing to do with who employed those people. And that's the way every statute governing seamen worked in 1925. There were a bunch of statutes that have a bunch of different limitations. But all of them were very explicit about what they were. And not a single one was employer-based. And that's for the second- to take the second reason, which is Flowers says, don't worry so much about the text. What we really want to think about is policy and purpose. And even if this Court were inclined to do so, even if this Court were inclined to define what Congress meant 100 years ago, we have some evidence about that. And Flowers says, look at the strikes that disrupted the national economy. In the maritime, in shipping, in maritime shipping, those strikes were led by people on lumber boats. And I'll note we cite in our brief the evidence that those people were on boats, were employed by the lumber companies and on boats owned by those companies. But if Congress was really trying to get at people who could disrupt commerce, the way strikes worked in 1925 is they weren't employer-based. Everybody who did the same job in the same location struck together. And that's why they were so disruptive. And so if Congress was trying to get at that, they would not have included an employer-based limitation. I think that's why we don't see one in the statute. To Justice Alito's point about narrowness, I think you asked that I address that in rebuttal. Two points on that. One is it's not true that the background rule in the circuits has been this employer-based industry requirement. The Seventh Circuit decision in Keenestray, I believe, was a concrete company. The Ninth Circuit has decisions on Amazon. The First Circuit does. I'm not aware of this requirement being true in any circuit until, really, the Second Circuit made this decision and the Eleventh Circuit had some decisions. But even in the Second Circuit, when the Second Circuit articulated, said that workers needed to be in the transportation industry, what it said was a basketball player is not in the transportation industry. It wasn't saying anything about who the employer was. And as the dissent in this case said in the Second Circuit, the well-established rule has been forever that if the residual clause covers anyone, it's truck drivers. And given that longstanding principle, I still haven't seen a single case where you have pizza delivery drivers or pest control workers or any of the people they're worried about. Actually, any court saying that they're exempt, despite the rule being ordinarily, no court has really looked at whether this kind of employer-based test. And the other thing is, you know, the Flowers makes a big deal of railroad employees. There are almost no railroad employees today. Almost all of those jobs are truckers now. And so we're not making the exemption broader. We're just taking the people who would have been railroad employees, and now they're truck drivers. And it so happens that trucking works just like maritime shipping, which is that some companies use companies like FedEx. And some companies do what Flowers did, which is essentially bring a trucking company in house themselves. There's no reason that those workers should be treated any differently. And the last point I want to make is just on administrability. Flowers hasn't explained how its test or how the Second Circuit's test would apply in this very case. And that's in two ways. One, there's no dispute here that Flowers sells transportation. The retailers that Flowers sells to are not just buying bread. They're buying the bread showing up at their retail stores. It's not clear to me why, for that reason alone, Flowers doesn't satisfy its own test. And the second point is, Flowers actually has quite a complicated corporate structure. And the drivers here aren't contracting with Flowers. They're contracting with a subsidiary of Flowers that only handles transportation for other subsidiaries that make baked goods. So that subsidiary is only transporting other people's goods. And Flowers doesn't explain why that, too, wouldn't satisfy its test. And what that shows is that its test, the employer-based industry test, is going to be really difficult to apply. And it's going to be difficult to apply even in cases that Flowers says, like this one, should be straightforward. They're not. And again, this would have been a problem in 1925, just as it is today. There were lumber companies that owned railroads that may or may not have shipped entirely the lumber company's goods. And it's not clear. Congress would have known in 1925 that that would have been difficult to apply. And there's no reason it would have included that requirement in the statute here. So again, we ask that this court reject Flowers' request to add this requirement that both  Thank you. Thank you, counsel. The case is submitted.